IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SANDRA C. MEYERS,                    *
                                     *
       Plaintiff,                    *
                                     *
vs.                                  *   CIVIL ACTION 08-00009-B
                                     *
MICHAEL J. ASTRUE,                   *
Commissioner of                      *
Social Security,                     *
                                     *
       Defendant.                    *

ORDER

Plaintiff Sandra Myers ("Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq. On December 19, 2008, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 18). Thus, this case was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636( c) and Fed.R.Civ.P. 73. (Doc. 19). Oral argument was held on December 30, 2008. Upon consideration of the administrative record, oral arguments, and memoranda of the parties, it is **ordered** that the decision of the Commissioner be **REVERSED** and **REMANDED**.

I.   Procedural History

Plaintiff filed an application for disability income benefits

on July 16, 2003. In her application, Plaintiff alleged that she had been disabled since September 6, 2002 due to diabetes and diabetic neuropathy.[1]   (Tr. 70-71, 83, 99).   Plaintiff's application was denied initially, and she timely filed a Request for Hearing.   (Tr. 49-50, 56-56-A).   On March 11, 2004, Administrative Law Judge Alan E. Michel ("ALJ Michel") held an administrative hearing, which was attended by Plaintiff and her representative.   ALJ Michel, on April 29, 2004, issued an unfavorable decision wherein he determined that Plaintiff is not disabled. (Tr. 235-245, 582-609).   Plaintiff requested review of the ALJ's decision by the Appeals Council ("AC"), and on February 10, 2005, the AC vacated the ALJ's decision and remanded the case for further proceedings.   (Tr. 257-259).

On April 18, 2005, a second administrative hearing was held before ALJ Michel.   In attendance at the hearing were Plaintiff, her representative and a vocational expert ("VE").   (Tr. 610-630). On June 24, 2005, ALJ Michel issued an unfavorable opinion, wherein he found   that Plaintiff is not disabled.   (Tr. 358-373). Plaintiff requested review of the ALJ's decision by the AC, and on

---

[1]In the Disability Report – Appeal dated August 25, 2004, Plaintiff reported new physical limitations as a result of carpel tunnel surgery on her right arm.   (Tr. 282).   In the Disability Report – Appeal dated January 4, 2006, Plaintiff reported debilitating diabetes, diabetic nephropathy and uropathy, and carpal tunnel syndrome.   Also, in the Disability Report – Appeal dated June 12, 2007 Plaintiff reported that her diabetic neuropathy had worsened.   (Tr. 426, 437).

August 24, 2006, the AC vacated the ALJ's decision and remanded the case for further proceedings.  The AC also directed that the case be assigned to another Administrative Law Judge.  (Tr. 374-375, 381-384).

On December 7, 2006, a third administrative hearing was held. Administrative Law Judge Glay E. Maggard conducted the third hearing, which was attended by Plaintiff, her representative and a VE.  (Tr. 631-658).  On April 26, 2007, ALJ Maggard issued an unfavorable opinion wherein he found that Plaintiff is not disabled.  (Tr. 25-41).  Plaintiff requested review of the ALJ decision by the AC, and on November 8, 2007, the AC denied Plaintiff's request for review.  (Tr. 11-14, 15-20).  As a result, the ALJ's decision became the final decision of the Commissioner in accordance with 20 C.F.R. § 404.981.  (Tr. 11)  The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.   <u>Issues on Appeal</u>

A.   Whether the ALJ erred by failing to assign controlling weight to the opinion of her treating physician.

B.   Whether the ALJ erred by failing to find Plaintiff credible.

## III. <u>Factual Background</u>

Plaintiff was born on January 4, 1965 and was 41 years old at the time of the third administrative hearing.  (Tr. 70, 631).

Plaintiff has a high school education and past relevant work ("PRW") as an assembler in an electric blanket plant. (Tr. 84, 99, 114-116, 592). Plaintiff testified that as an assembler she stood 10 to 12 hours a day, ran heavy machines, and lifted and carried blankets. According to plaintiff, she frequently lifted 25 pounds, and 50 pounds was the heaviest she would lift. (Tr. 115, 596, 635).

At the March 2004 hearing, Plaintiff testified that she has been diabetic for 21 years, that she has an insulin pump attached to her body, and that the pump allows her to adjust her insulin several times during the day. (Tr. 602-603). She also testified that she had neuropathy which prevents her from working, and that she experiences dizzy spells four or five times a week. (Tr. 600-604). Plaintiff also testified that she had surgery for carpal tunnel syndrome in 2004, that her hands hurt badly if she repeatedly lifts or carries things, and that she now has to wear a brace if she engages in any activity for more than one hour. (Tr. 600-601, 606-607).

According to Plaintiff, she is able to bath, dress and groom herself without help, and she drives her car five or six miles every couple of days. Plaintiff also testified that she is able to cook light meals, but her husband does the grocery shopping and most of the other chores around the house. (Tr. 598).

4

At the April 2005 administrative hearing, Plaintiff testified that she is still having problems with diabetes and diabetic neuropathy, and that she has been hospitalized as a result. (Tr. 615). Plaintiff testified that she has no strength in her right hand, has pain in her right and left hands and that she has trouble gripping and picking things up. (Tr. 615-616). Plaintiff further testified that her diabetic neuropathy causes stinging and burning pain on a daily basis, and that her medication does not relieve the pain, but instead causes her to be drowsy and to sleep all day. (Tr. 616-617). Plaintiff also testified that she was still not able to assist with housework and shopping. (Tr. 618).

At the December 2006 administrative hearing, Plaintiff testified that her insulin pump has helped her diabetic condition, that she cannot function when her blood sugar goes up, and that she faints when her diabetes is out of control[2]. (Tr. 636, 638-639). She testified that she had not seen her doctor for the carpal tunnel syndrome in a year, but that she was still having trouble holding onto things. Plaintiff described burning, sharp pain in her feet, and testified that no medications have helped the pain. She also stated that she cannot function when her blood sugar goes up. (Tr. 637-638). With respect to her daily activities, Plaintiff testified that on good days, she goes to the grocery

---

[2]Plaintiff testified that the most recent fainting epidose occured a month and a half earlier. (Tr. 639).

store, and that her husband and teenaged daughter help her out around the house. (Tr. 639-640). Plaintiff also testified that she reads three or four hours per day, and is able to take care of her personal needs. She indicated that she does not drive much because her medication causes her to be dizzy and sleepy. (Tr. 646-647).

**IV.** **Analysis**

    **A.** **Standard of Review**

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990).[3] A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla but less than a preponderance" and consists of "such relevant evidence as a

---

[3]This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

reasonable person would accept as adequate to support a conclusion[]"). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. <u>Chester v. Bowen</u>, 792 F. 2d 129, 131 (11th Cir. 1986); <u>Short v. Apfel</u>, 1999 U.S. DIST. LEXIS 10163 (S.D. Ala. 1999).

**B.    Discussion**

An individual who applies for Social Security disability benefits must prove his disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability. 20 C.F.R. §§ 404.1520, 416.920.[4]  Additionally, an individual who applies for

---

[4]The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at

disabled widow's benefits must show that she is the widow of the deceased wage earner, that she has attained age 50, that she is unmarried[5] and that she is under a disability that began no later than seven years after the wage earner's death.   20 C.F.R. § 404.335(e).

In the case <u>sub judice</u>, the ALJ determined that Plaintiff met the non-disability requirements for disability insurance benefits through December 31, 2007.  (Tr. 40).  The ALJ found that she has not engaged in substantial gainful activity since her alleged onset date.  <u>Id.</u>  The ALJ concluded that while Plaintiff has the severe impairments of longstanding insulin dependent diabetes mellitus, mild diabetic peripheral neuropathy in the lower extremities, and

---

the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work.  <u>Jones v. Bowen</u>, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history.  <u>Id.</u> at 1005.  Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history.  <u>Sryock v. Heckler</u>, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999).  <u>See also</u> <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing <u>Francis v. Heckler</u>, 749 F.2d 1562, 1564 (11th Cir. 1985)).

[5]Exceptions apply to the requirement that Plaintiff be unmarried, none are at issue here.

8

history of mild carpal tunnel syndrome, mostly in the right upper extremity, they do not meet or medically equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulations No. 4. Id. The ALJ found that Plaintiff's allegations regarding her limitations were not totally credible. Id.

The ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") for a full range of unskilled sedentary work activity on a regular and sustained basis since September 2002. The ALJ concluded that Plaintiff's RFC precludes her from performing her past work as an electric blanket factory assembler. (Tr. 40). The ALJ found that Plaintiff can perform jobs that exist in significant numbers in the national economy, such as general information clerk, receptionist and call out operator, and that vocational expert testimony supports this conclusion. (Tr. 41).

The relevant evidence of record[6] includes treatment notes from Stephen Davis, M.D. who began treating Plaintiff as early as 1998. In July 1998, Dr. Davis diagnosed Plaintiff with Type-I diabetes and probable iron deficiency anemia. (Tr. 167). Plaintiff

---

[6]While other records related to Plaintiff's treatment have been reviewed, only those medical records that bear on the issues before the Court are addressed. For instance, the undersigned notes that additional records were submitted to the AC for review; however, those requests were not before the ALJ, and Plaintiff's request for review was denied; thus, those records are not before this Court.

returned to Dr. Davis on March 24, 2000, complaining of a recent urinary tract infection, and feeling tired and without energy.  Her physical exam was normal, and she was diagnosed with Type-I diabetes, history of iron deficiency anemia, fatigue and recent urinary tract infection.  (Tr. 167).

Treatment notes from April 14, 2000 show that Plaintiff was diagnosed with Type-I diabetes, under much better control.  (Tr. 166).  During a September 22, 2000 visit, Plaintiff reported that her diabetes had been under better control.  Plaintiff's physical exam was normal except for right flank tenderness.  She was diagnosed with recent urinary tract infection, yeast infection, diabetes, and history of iron deficiency anemia, and was referred to a urologist.  (Tr. 166).

Plaintiff saw Dr. Davis on two occasions in 2001.  On February 2, 2001, Plaintiff reported that she had "conked out" and had a wreck.  She was diagnosed with Type-I diabetes, history of iron deficiency anemia, and recurrent urinary tract infections.  During Plaintiff's May 4, 2001 visit, her physical exam was normal except for tenderness in the right upper quadrant.  Dr. Davis diagnosed her with right upper quadrant pain, and referred her for an ultrasound.  (Tr. 165).  The ultrasound was performed on May 5, 2001, and revealed no abnormality.  (Tr. 176).

Plaintiff was seen by Dr. Davis on five occasions in 2002.  During her June 2002 visit, Plaintiff reported syncope episodes,

unrelated to her diabetes. She was diagnosed with Type-I diabetes, history of iron deficiency anemia, and recurrent syncope, and referred to a neurologist. (Tr. 164).

Plaintiff was seen by neurologist John G. Yager, M.D., on July 1, 2002. Dr. Yager noted that Plaintiff is an insulin-dependent diabetic with no history of seizures. Dr. Yager reported that Plaintiff's neurological examination was normal, and his clinical impression was "episodes of inattention, cannot rule out some degree of absence seizure activity-Questionable transient global amnesia." (Tr. 137-138). An electroencephalogram dated July 12, 2002 was in the normal range. (Tr. 162).

Plaintiff was seen by Dr. Davis on September 6, 2002. Plaintiff reported that she could not work because of the pain in her legs, more in the left lower extremity when she walks. Her physical exam was normal except for a little fullness in her left upper anterior thigh and some diminished sensation in her left lower extremity. Dr. Davis diagnosed her with pain in her left lower extremity, and ordered a lumbar spine MRI and nerve conduction studies of her legs. (Tr. 161). Nerve conduction findings dated September 12, 2002 were "essentially normal," noting that conduction velocities in her lower extremies were "borderline low." A lumbar spine MRI was also normal. (Tr. 153-160, 168, 170, 171, 172-175).

Plaintiff's blood sugar was elevated during her September 18,

2002 office visit. Her physical exam was normal except for mild decreased sensation in her distal lower extremities, but no real pain on palpation, with pulses okay and no edema. Plaintiff was diagnosed with apparent diabetic neuropathy, Type-I diabetes, and history of iron deficiency anemia. (Tr. 152). During her October 2002 visit, Plaintiff reported bilateral lower extremity pain below the knees, and that her sugar was still running high. She also reported that Elavil helped a little, but made her sleepy. Her physical exam was normal, and Dr. Davis diagnosed her with persistent leg pain and diabetes. He instructed her not to work for a couple of weeks, and to return for a follow-up with Dr. Yager. (Tr. 151).

Plaintiff was seen by Dr. Yager on October 25, 2002. She reported that she had not experienced any more syncopal episodes, and she complained of numbness and burning pain below her knees. Plaintiff also reported that her nerve conduction velocity tests were abnormal. Plaintiff's physical exam was normal except for stocking distribution decreased sensation to vibration, cool and pinprick sensation, and trace ankle jerks. Dr. Yager diagnosed Plaintiff with probable mild peripheral neuropathy, probably diabetic. (Tr. 135-136).

Plaintiff was treated by Dr. Davis during November and December 2002. (Tr. 147, 150). The notes reflect that during both visits, her physical exam was normal except slightly diminished

sensation in the distal lower extremities. In November, Dr. Davis noted that Plaintiff's grip strength seemed reasonable. (Tr. 150). Additionally, in December, Dr. Davis noted that Plaintiff had a slightly enlarged thyroid, possibly a goiter. (Tr. 147). Dr. Davis diagnosed Plaintiff with Type-I diabetes, apparent atypical diabetic neuropath, possible goiter, colon polyp and apparent iron deficiency anemia. (Tr. 150).

On referral from Dr. Davis, Robert D. Lerner, M.D., examined Plaintiff on November 26, 2002, and observed that her physical examination was normal, except for a goiter with an enlargement of the right lobe of the thyroid. He ordered a full work-up. (Tr. 148-149). A December 6, 2002 report of colonoscopy reflects that the colonoscopy revealed a colon polyp. "[N]o dangerous pathology" was noted. (Tr. 139-142).

Plaintiff was treated by Dr. Davis on eight occasions during 2003. Her physical exams were normal except for minimal sensation in the distal lower extremities. Plaintiff reported that the medicine was helping but she was still having some pain in her legs and arms. On several occasions, it was noted that Plaintiff had excellent pulses, and her diagnosis generally remained the same, except that iron deficiency anemia from heavy menstruation was added during October 2003. (Tr. 143-146, 194-198).

Plaintiff was treated in the intensive care unit at Washington County Hospital on November 25, 2003. Plaintiff reported nausea,

vomiting and shortness of breath.  Her blood sugar level was 423.
She was transferred to Mobile Infirmary, and placed in the
Intensive Care on an insulin drip.  (Tr. 293-297).  On physical
exam at Mobile Infirmary, Plaintiff was described as acutely ill-
appearing with soft but tender abdomen.  Her blood sugar was over
400.  She was discharged on November 27, 2009.  On discharge,
Plaintiff was hydrated and improved, and her blood sugars were
stable at around 200.  She was diagnosed with diabetic
ketoacidosis[7] and Type-I diabetes.  (Tr. 296).  Plaintiff was seen
by Dr. Davis on December 8, 2003.  Dr. Davis observed that
Plaintiff "looks and feels great" after her hospital stay.  He
diagnosed Plaintiff with Type-I diabetes and neuropathy in the
distal lower extremities and iron deficiency anemia.  (Tr. 195).

Plaintiff had approximately five follow-up visits with Dr.
Davis in 2004.  During the January visit, Dr. Davis noted that upon
exam, Plaintiff had good circulation in both hands, grip strength
that seems okay bilaterally and a cystic tender lesion on her right
forearm.  He diagnosed her with Type-I diabetes with neuropathic
pain in her arms and iron-deficiency anemia, and ordered nerve
conduction studies on her arms and cervical spine x-rays.  (Tr.
207).

---

[7]Ketoacidosis is a complication of diabetic mellitus where
there is a buildup of keytones due to a breakdown of stored fats
for energy.  See www.medilexicon.com (Last visited December 17,
2008).

Plaintiff underwent nerve conduction studies on her arms on January 12, 2004. The studies revealed a finding of moderately severe bilateral carpal tunnel syndrome, worse on the right than the left. (Tr. 230-232, 305-308). Plaintiff was seen by Ben Freeman, M.D., who opined that she had "a classic case of carpal tunnel," and that she had some degree of peripheral polyneuropathy. He further noted that Plaintiff had frequent episodes of numbness, and recommended carpal tunnel release. (Tr. 446). Plaintiff underwent a right carpal tunnel release on February 18, 2004, and on March 9, 2004, Dr. Freeman observed that Plaintiff was "doing very well," and that she was pleased with the results. (Tr. 233-234, 300).

Dr. Davis completed a Physical Capacities Evaluation on February 27, 2004. He opined that Plaintiff can sit three hours and stand and walk two hours at a time, and can sit five hours and stand and walk four hours total in an eight-hour workday. According to Dr. Davis, Plaintiff can lift and carry up to five pounds frequently, up to twenty pounds occasionally, and never over twenty pounds. Dr. Davis opined that Plaintiff cannot use her right hand for simple grasping, pushing or pulling arm controls or fine manipulation, cannot use her feet for repetitive action, cannot crawl or climb, and can bend, squat and reach occasionally. He further opined that Plaintiff is mildly restricted from exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes and gases. He also opined

that Plaintiff has no restrictions with respect to activities involving unrestricted heights and being around moving machinery. Dr. Davis opined that these restrictions had existed for six months, and that Plaintiff is unable to work eight-hour days, 40 hours a week on a sustained basis.  (Tr. 209).

Dr. Davis also completed a Diabetes Questionnaire on the same day.  He noted that he had been treating Plaintiff for six years for Type-I diabetes, a diagnosis supported by increased blood sugars. He stated that Plaintiff's blood sugar levels have been maintained under good control within normal limits, and that she has diabetic neuropathy that causes pain and weakness in both her legs.  Dr. Davis indicated that Plaintiff does not suffer from acidosis at least once every two months, and does not suffer from retinitis proliferans.  He opined that the degree of limitation on Plaintiff's ability to perform work activity is moderately severe.  He opined that Plaintiff could not engage in any form of gainful employment on a repetitive, competitive and productive basis over an eight-hour workday, forty hours a week, without absences or frequent interruptions to her work routine due to her diabetic condition. (Tr. 210-211).

Plaintiff presented to Washington County Hospital on May 16, 2004, with vomiting, nausea and diarrhea, and high blood sugar. Her physical exam was normal except for mildly labored breathing and abdominal tenderness.  She was diagnosed with diabetic ketoacidosis,

vomiting, abdominal tenderness, anemia, and thrombocytopia[8], and was transferred to Mobile Infirmary . (Tr. 447-453). Treatment notes from Mobile Infirmary reflect that Plaintiff was transferred from Washington County emergency room with diabetic ketoacidosis, which resulted from a malfunction of the tubing in her insulin pump. A chest x-ray on this day was negative. Plaintiff was diagnosed with diabetic ketoacidosis and iron deficiency anemia, and was discharged on May 18, 2004. (Tr. 301-304).

Dr. Davis's treatment notes dated August 10, 2004 reflect that Plaintiff was doing fairly well on the pump, but reported problems with her right carpal tunnel symptoms. Her physical exam was normal, except for Dupuytren's contracture[9] on the right and decrease sensation in her lower extremities, with pulses okay and reflexes diminished. Plaintiff was diagnosed with Type-I diabetes, neuropathy, carpal tunnel syndrome and chronic iron deficiency anemia during both her August and September doctor's visits. (Tr. 322-323).

Plaintiff presented to Washington County Hospital on October 25, 2004 after injuring her left ankle when falling as she stepped

---

[8]Thrombocytopia is a decrease in the number of blood platelets. See www.nlm.nih.gov (Last visited December 18, 2008).

[9]Dupuytren's contracture is a condition marked by a shortening and thickening of the palmar aponeurosis that results in flexion contracture of the fingers into the palm of the hand. See www.nlm.nih.gov (Last visited December 17, 2008).

off a four-wheeler.  An x-ray of her left ankle was negative.  She was diagnosed with ankle sprain.  (Tr. 316-318).  Upon examination by Dr. Davis on November 1, 2004, Plaintiff's exam was normal except for diminished reflexes in the lower extremities and a little pain and swelling in her left ankle.  Her pulses were good, with no edema.  (Tr. 321).

Treatment notes from Dr. Freeman dated December 13, 2004 reflect that he ordered therapy for Plaintiff's ankle, and instructed her to limit her activity.  He diagnosed Plaintiff with burning hypesthesia right knee, likely secondary to diabetic neuropathy, peripheral neuropathy, possibly related to entrapment of the peroneal nerve, and noted that it is a "very rare condition." (Tr. 325).

Plaintiff presented to the emergency room at Washington County Hospital on January 18, 2005, complaining of back pain, elevated blood glucose, blood in her stools and vaginal bleeding.  She was transferred to Mobile Infirmary, where she was admitted.  She reported back pain, nausea, vomiting, vaginal bleeding and ketoacidosis, with blood sugars around 400.  Her physical exam was normal except for some mild pain to percussion in the lower back. (Tr. 337, 338, 455, 456-457).  Charles M. Rogers, IV, M.D., did a consultative exam, and diagnosed Plaintiff with menometrorrhagia.[10]

---

[10]Menometrorrhagia is excessive uterine bleeding, during menstrual periods and at other irregular intervals.  See www.medterms.com (Last visited December 18, 2008).

He recommended a hysterectomy.  An abdominal x-ray was negative, and a pelvic ultrasound showed minimal free fluid in the posterior cul-de-sac, and was otherwise negative.  (Tr. 339-341, 458-468).  During her hospital course, Plaintiff was treated with intravenous fluids and insulin, and her blood sugars came down.  (Tr. 337-338).

Plaintiff was treated by Dr. Davis four times during 2005. Office notes dated January 26, 2005 reflect that  that Plaintiff was out of the hospital after an episode of ketoacidosis, with menstrual bleeding and back pain.  Her physical exam was normal, and Dr. Davis diagnosed Plaintiff with excessive menstrual bleeding with back pain and anemia, diabetes with episode of ketoacidosis and history of diabetic neuropathy.  (Tr. 327). During Plaintiff's May 2005 visit, Dr. Davis observed decreased sensation in the distal lower extremities, and tenderness in the dorsum of the left foot, and noted no heat or redness.  (Tr. 479).  Plaintiff's August exam was also essentially normal except for enlarged thyroid.  (Tr. 478).

The medical records reflect that during 2005, Plaintiff underwent a hysterectomy in February, and a laparoscopic bilateral salpingo-oophorectomy in October due to recurrent ovarian cysts that were resistant to medical management. (Tr. 332-335, 517-523)

Plaintiff was treated by Dr. Davis on six occasions in 2006. In January 2006, Plaintiff reported pain on the bottoms of her feet, and that she was "still trying to work".  Plaintiff denied any back pain.  Plaintiff's exam was normal except for diminished sensation

in the distal lower extremities.  (Tr. 502).  Likewise, her May, June and July  exams were normal except for diminished sensation in the distal lower extremities.  (Tr. 499-501).  In June, she had some cracking in both heels, but no ulceration.  (Tr. 500).

Plaintiff was seen by podiatrist James H. Morgan, Jr., D.P.M., on June 19, 2006 following a referral from Dr. Davis for problems with dry cracked heels.  On examination, Dr. Morgan noted a normal examination except for sharp, dull and vibratory sensations to the digits of both feet, hyperkeratotic fissuring eczema on the periphery of both heels, and mild hammer toe deformities 2-5 on both feet.  He noted that ankle, subtalar, midtarsal range of motion were unrestricted and pain free.  (Tr. 496).

Plaintiff was seen at Washington County Hospital Emergency Room on October 12, 2006. Plaintiff reported being sick, nauseous and vomiting for four to five days and that she hurt all over.  Plaintiff's blood sugar was over 500.  Plaintiff was described as being in moderate distress and confused.  On physical exam, Plaintiff was moderately to severely distressed and lethargic, with dry mouth and increased bowel sounds.  Her blood sugar was reduced to 398, and she was diagnosed with dehydration and diabetic ketoacidosis and was transferred to Mobile Infirmary.  (Tr. 503-506).

Treatment notes from Mobile Infirmary dated October 12, 2006 reflect that Plaintiff was transferred from Washington County

Infirmary with diabetes out of control and dehydration.  On physical exam, she appeared dehydrated, and her mucous membranes were dry. Impressions were dehydration and diabetes out of control with early ketoacidosis that did not appear to be a pump failure.  Plaintiff was placed on intravenous fluids and was given supplemental insulin. Her glucose values improved significantly, and her condition became stable.  She was discharged on October 15, 2006, with diagnoses of "nausea and vomiting and diabetes mellitus, poorly controlled". (Tr. 524-527).

Plaintiff was seen by Dr. Davis on November 1, 2006.  He noted that Plaintiff had been hospitalized the prior month for hyperglycemia and dehydration.  Dr. Davis also noted that Plaintiff was still on the insulin pump and liked it.  On physical exam, Dr. Davis observed that Plaintiff's sinuses were tender, her head was congested, and that her lungs sounded okay.  She was diagnosed with Type-I diabetes with neuropathy and upper respiratory infection. (Tr. 508).

Dr. Davis completed a Physical Capacities Evaluation on November 21, 2006.  He opined that Plaintiff can sit, stand or walk one hour at a time and two hours total in an eight-hour workday, lift and carry up to three pounds for two hours and up to ten pounds for one hour total in an eight-hour workday.  He opined further that Plaintiff cannot use her arms or hands for any repetitive action, and cannot crawl or climb at all.  He indicated that she can bend,

squat and reach for one hour in an eight-hour workday. Dr. Davis further opined that Plaintiff cannot engage in activities that involve being around moving machinery, and is moderately restricted from activities at unprotected heights and those that involve exposure to marked changes in temperature and humidity. According to Dr. Davis, Plaintiff is mildly restricted from activities involving driving automotive equipment or exposure to dust, fumes or gases. He also opined that Plaintiff cannot work eight-hour days, 40 hours per week on a sustained basis without missing more than two days of work per month, and that the Plaintiff's impairments have existed for four years. (Tr. 507).

In an undated Attending Physician's Statement for Colonial Supplemental Insurance, Dr. Davis opined that Plaintiff is moderately limited in functional capacity, is capable of sedentary activity, and has a slight mental limitation in that she is able to function in most stressful situations and engage in most interpersonal relations. (Tr. 530-531). Also, in a statement dated June 5, 2006, Dr. Davis he again opined that Plaintiff is moderately limited in functional capacity and is capable of sedentary activity, but has a moderate mental limitation in that she is able to engage in only limited stress situations and engage in only limited interpersonal relationships. (Tr. 528-529).

The record evidence reflects that an agency disability specialist completed a Residual Physical Functional Capacity

Assessment on September 6, 2003.  She opined that Plaintiff is limited to lifting or carrying 20 pounds occasionally and 10 pounds frequently, and standing, walking, sitting about six hours in an eight-hour workday.  She further opined that Plaintiff is limited to occasional pushing and pulling with lower extremities bilaterally, occasional crawling, climbing ramps and stairs and never climbing ladders, ropes and scaffolds.  She also opined that Plaintiff has no manipulative, visual or communicative limitations, but that Plaintiff should avoid unrestricted heights and hazards. (Tr. 177-184).

Mohammad A. Nayeem, M.D. examined Plaintiff on behalf of the agency on July 15, 2004.  He found that Plaintiff was in no acute distress, pain or discomfort, and that her exam was normal except for the lack of sensation on the palmar aspect of the right little finger and weakness in the lumbricals of the right little finger. Her finger movements were normal, and there was no swelling, deformity or joint tenderness.  He also observed that general examination of Plaintiff's legs and feet was normal, and that she had no edema, and sensations were intact for pain, touch and temperature on both sides.  (Tr. 313-315).

Dr. Nayeem diagnosed Plaintiff with adult onset insulin dependent diabetes mellitus, under control with insulin pump and diabetic polyneuropathy of right upper extremity with numbness and occasional episodes of pain.  Dr. Nayeem concluded that Plaintiff

can read, write and perform almost all functions.  He noted that she walks with a normal gait without an assistive device, but does not have a lot of reserve capacity to perform continuous and sustained physical activity. He opined that Plaintiff's ideal job would have her sitting down, with no heavy physical activity for more than a few minutes at a time.  (Tr. 315).

Ilyas A. Shaikh examined Plaintiff on March 28, 2005 at the request of the agency.  Dr. Shaikh's examination of Plaintiff was normal except for no right ankle jerk and a positive Phalen test[11] in her right hand.  He diagnosed Plaintiff with possible right carpal tunnel syndrome recurrence, possible lower extremities diabetic neuropathy and poorly controlled insulin-dependent diabetes mellitus.   Dr. Shaikh observed that a patient can have carpal tunnel syndrome in the presence of negative clinical tests like Tinel or Phalen, and can have mild diabetic neuropathy with normal sensory motor findings.  He noted that he was unable to produce right ankle reflex, which could be due to radiculopathy or severe neuropathy, and that the areflexia[12] in her right ankle may cause her ankle to give out.  (Tr. 350-353).  Dr. Shaikh observed on a range of motion chart that Plaintiff's range of motion was normal in all areas.  (Tr.  354).

------------------------------------------------------------------------

[11]Phalen sign is a test for carpal tunnel syndrome.  See www.webmd.com (Last visited December 18, 2008).

[12]Areflexia is the absence of reflexes.  See  www.medline.com (Last visited December 18, 2008).

In the Medical Source Opinion on the same day, Dr. Shaikh opined that Plaintiff can stand or walk for one hour at a time and four hours total in an eight-hour workday, and can sit for three hours at a time and six hours total in an eight-hour workday due to her poorly controlled diabetes.  He further opined that she can lift or carry ten pounds constantly, 20 pounds frequently, and 30 pounds occasionally, but can never lift 55 pounds or carry 50 pounds due to her carpal tunnel syndrome.  He also opined that Plaintiff can constantly finger, feel, talk, and hear, can frequently push and pull with her right and left arms and her left foot, handle and reach overhead, and can occasionally push and pull with her right leg, climb, balance, stoop, kneel, crouch, and crawl.  Dr. Shaikh opined that due to Plaintiff's poorly controlled diabetes, she should never be exposed to fumes, noxious odors, dust, mists, gases or poor ventilation, that she can occasionally drive, and can occasionally be exposed to wetness or humidity, vibration, moving mechanical parts or high exposed places.  (Tr. 355-357).

In a Physical Residual Function Capacity Assessment dated November 10, 2005,  an agency medical consultant, Susan Davis, opined that Plaintiff is limited to lifting 20 pounds occasionally and 10 pounds frequently, that she is limited to standing, walking and sitting about six hours in an eight-hour workday, and that she is unlimited in pushing and pulling hand and foot controls. According to Ms. Davis, Plaintiff should never climb ramps, stairs,

ladders, ropes or scaffolds, and should avoid concentrated exposure to extreme cold and heat, and to hazards such as machinery and heights. Ms. Davis also opined that Plaintiff has no limitations on her ability to balance, stoop, kneel, crouch or crawl, that she has no manipulative, visual or communicative limitations, and is unlimited in her exposure to wetness, humidity, noise, vibration, and fumes, odors, dusts, gases and poor ventilation. (Tr. 488-495).

1. **Whether the ALJ erred by failing to assign controlling weight to the opinion of Plaintiff's treating physician**.

Plaintiff asserts that the ALJ erred in failing to assign controlling weight to the opinion of Plaintiff's treating physician, Dr. Stephen Davis.  In finding that Plaintiff is able to perform a full range of sedentary work, the ALJ discounted the opinion of treating physician Dr. Davis as follows:

> I have certainly not ignored Dr. Davis' multiple opinions during my assessment of the claimant's physical capacity. However, it should again be noted that the claimant admits his estimates are based on her own subjective assertions and not far more reliable objective medical data and findings.  Furthermore, one opinion rendered by Dr. Davis in August 2006 is not, in and of itself, inconsistent with the claimant's placement in sedentary clerical and administrative activities.  (Exhibit 41F). The physician actually in the best position to fully evaluate the claimant's purported neurological symptomatic complications is Dr. Shaikh, a well credentialed neurologist.  His restrictions do not at all match the more draconian limitations cited by Dr. Davis, which we now know are predicated on what the claimant reports subjectively being able to perform.  Therefore, I have ample justification to disregard, set aside Dr. Davis' disability opinion, thereby not assigning them "controlling" evidentiary weight in this case (20 C.F.R. § 404.1527(d)).

(Tr. 38).

In rejecting Dr. Davis's opinion, the ALJ also found as follows:

> [T]he claimant has carried a diagnosis of "probable mild [diabetic] neuropathy" in the lower extremities since fall 2002 (Exhibit 1F). It is interesting to note that NCV testing of her lower extremities in September 2002 produced "essentially normal" results (Exhibit 3F,P.14). Yet the claimant, as part of a pattern of exaggeration over time, advised an examining neurologist several weeks later that her test results were "abnormal" (Exhibit 1F, P.2). I further note that EEG testing administered at the time to fully evaluate assertions of dizziness and blackout episodes also produced normal results (Exhibit 3F, P.20). . . . Dr. Davis, a long time treating internist, was repeatedly diagnosing the claimant by early calendar 2003 as having "apparent diabetic neuropathy" in the lower extremities, based on her own subjective complaints of "mild decreased sensation" in both lower legs below the knee level (Exhibit 3F, PP. 1-6).

(Tr. 36).

It is well settled that "[t]he opinion of a treating physician is entitled to substantial weight unless good cause exists for not heeding the treating physician's diagnosis." Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991). See, e.g., Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1159-1160 (11th Cir. 2004); Phillips v. Barnhart, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); Lewis v. Callahan, 125 F.3d 1436, 1439-1441 (11th Cir. 1997); 20 C.F.R. § 404.1527(d)(2). "[G]ood cause exists when the (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's

27

opinion was conclusory or inconsistent with the doctor's own medical records." <u>Phillips</u>, 357 F.3d at 1240-1241 (citing to <u>Lewis</u>, 125 F.3d at 1440). <u>See also</u> <u>Edwards v. Sullivan</u>, 937 F.2d 580 (11th Cir. 1991) (holding that the ALJ properly discounted a treating physician's report where the physician was unsure of the accuracy of his findings and statements). If the ALJ disregards or accords less weight to the opinion of a treating physician, the ALJ must clearly articulate his reasons, and the failure to do so is reversible error. <u>MacGregor v. Bowen</u>, 786 F. 2d 1050, 1053 (11th Cir. 1986).

While the ALJ offered a couple of reasons for rejecting Dr. Davis' assessments and opinions, it is clear that the main reason for the rejection was the ALJ's belief that Dr. Davis' assessments and opinions were based solely on Plaintiff's subjective complaints to Dr. Davis. According to the ALJ, Plaintiff admitted as much during the administrative hearing conducted on December 7, 2006. Contrary to the ALJ's assertion, a review of the exchange between Plaintiff and the ALJ does not reflect that Plaintiff admitted that Dr. Davis's functional assessments were based solely on Plaintiff's subjective complaints.

> Q:   Mrs. Meyers, Dr. Davis has completed two forms that shows how long you could sit, stand and walk and so on. Were you present when those forms were completed?
>
> A:   Yes, sir.

28

Q:   And did Dr. Davis discuss with you what your limits
     were?

A:   Yes, sir.

Q:   And you told him what your limits were?  You told
     him how much you could carry –

A:   About –

Q:   -- and how long –

A:    – yes, sir.

Q:   – you could sit and so long?

A:   – Yes, sir.

Q:   Are those the answers that he put down on that
     form.

A:   No, sir.

Q:   They're not?

A:   I mean, I just told him what I thought I could do,
     you –

Q:   Oh, okay.

A:   – know, but –

Q:   And he was writing while you were –

A:   yes, sir.

29

> ALJ: – telling him that?  All right.  That's all.  All
> right.

(Tr. 648-649).  While it is clear from this testimony that Dr. Davis queried Plaintiff about her daily activities and what she thought she was physically capable of doing, Plaintiff never testified that in completing the assessments, Dr. Davis relied solely on the information that she provided to him, and it was error for the ALJ to draw this conclusion.  The record reflects that Dr. Davis has a long term treatment relationship with Plaintiff and that he has examined her on countless occasions.  In view of such, it was inappropriate for the ALJ to necessarily assume that rather than relying on his history of treating Plaintiff, Dr. Davis relied solely on Plaintiff's subjective reports to formulate his opinions.

Additionally, it is noteworthy that the ALJ's decision contains several misstatements. For instance, the ALJ questioned Dr. Davis's diagnosis of "mild peripheral neuropathy," and asserts that Dr. Davis only referred to the presence of some diminished sensation in Plaintiff's lower extremities on a single occasion, in an office note completed on July 31, 2006.  In reality, the Davis' treatment notes are replete with references to Plaintiff's diminished sensation in her lower extremities.  (Tr. 143, 145, 146, 147, 150, 152, 161, 196, 197, 198, 320, 323,  479, 499, 500, 501, 502), and reduced or absent ankle jerk reflexes on physical exams

(Tr. 135, 320, 323, 352, 353).  The ALJ's decision overlooks these references.  Additionally, the ALJ implies that nerve conduction studies that were "essentially normal" contradict Dr. Davis' diagnosis of "mild peripheral neuropathy"; however, in his evaluation, Dr. Shaikh, whose opinion the ALJ relied upon, noted as follows:

[M]ild diabetic neuropathy may have normal sensory motor findings. I was unable to produce right ankle reflex on this patient.  This may be due to radiculopathy or severe neuropathy as well.

(Tr. 352-353).  Accordingly, while the ALJ offered Dr. Davis's diagnosis of "mild peripheral neuropathy" as a basis for questioning his assessments and opinions, Dr. Davis' diagnoses is supported by the record evidence.

    In rejecting Dr. Davis' assessments and opinions, the ALJ also held that the physician actually in the best position to fully evaluate Plaintiff's purported neurological symptomatic complications is Dr. Shaikh, a well regarded neurologist.  The ALJ further noted that Dr. Shaikh's restrictions do not at all match the more draconian limitations cited by Dr. Davis.  While the regulations provide that more weight can be accorded to the opinion of specialists, a careful review of Dr. Shaikh's report reflects that he did not contradict any of Dr. Davis' diagnosis, and that he opined that Plaintiff's diabetes was poorly controlled.  This finding is consistent with the record evidence that reflects that Plaintiff was hospitalized on four occasions with blood sugar

levels at 400 or above. While the ALJ downplays the hospitalizations and indicates that other things, such as a malfunctioning insulin pump or heavy menstrual bleeding led to the hospitalizations, whatever the triggering event, Plaintiff's blood sugar level was out of control and necessitated immediate hospitalization. This evidence, including Dr. Shaikh's opinion, that Plaintiff's diabetes is poorly controlled, supports rather than contradicts Dr. Davis's opinion that Plaintiff's condition is likely to result in absences and frequent interruptions in her work routine. (Tr. 210-211).

In rejecting Dr. Davis' opinion, the ALJ also noted that in August 2006, Dr. Davis, in a written statement to Colonial Insurance, opined that Plaintiff could engage in clerical and administrative activities. A review of the form indicates that Dr. Davis opined that Plaintiff is moderately limited in her functional capacity, and that she is capable of clerical/administrative (sedentary) activity (60-70%). In addition, in response to the question "What about this patient's condition would need to change for you to support return to full-time work capacity, Dr. Davis responded "disappearance of neuropathy." (Tr. 529). Accordingly, this statement does not conflict with Dr. Davis' opinion that Plaintiff cannot maintain 40 hours per week employment on a sustained basis without missing more than two days of work per month.

Additionally, at another place in the decision, the ALJ asserts that Plaintiff's physical activities belie her claim of substantially limited functional capacity, and he notes that the medical records reflect that Plaintiff injured her ankle stepping off of a three wheeler, and while playing basketball. (Tr. 36-37). During the December 2006 administrative hearing, Plaintiff was not questioned regarding the three wheeler incident; thus, the circumstances surrounding that incident are not clear. However, in the Commissioner's brief, he concedes that the records regarding the basketball injury involved an altogether different claimant, yet, the ALJ relied upon those records in finding that Plaintiff's physical activities belie her claim of disability.

In sum, the undersigned finds that not only did the ALJ misstate key record evidence, but he did not provide adequate reasons for rejecting Dr. Davis's opinion that due to Plaintiff's condition, she cannot maintain 40 hours per week employment on a sustained basis without missing more than two days of work per month.

## V.   Conclusion

For the reasons set forth, and upon careful consideration of the administrative record, memoranda of the parties and oral argument, it is **ORDERED** that the decision of the Commissioner of Social Security, denying Plaintiff's claim for period of disability and disability insurance benefits, be **REVERSED and REMANDED.**

**DONE** the **29**th  day of **September, 2009.**

                    /s/ SONJA F. BIVINS
         UNITED STATES MAGISTRATE JUDGE